## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| RANDY and TRISHA HOWARD, individually and on behalf of a class of similarly situated persons, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO.: 09-820 |
| BAYROCK MORTGAGE CORPORATION, FIRST AMERICAN CORPORATION, UNITED GENERAL TITLE INSURANCE COMPANY and BANK OF AMERICA, NATIONAL ASSOCIATION as Successor by Merger to LaSalle Bank National Association, as Trustee for the registered holders of Bears Stearns Asset Backed Securities I Trust 2007-HE4 Asset-Backed Certificates, Series 2007-HE4. | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) ) | **JURY DEMANDED** |
| | ) | **CLASS ACTION** |

## COMPLAINT

## INTRODUCTION

1.     This complaint is filed under the Truth-In-Lending Act (TILA) 15 U.S.C. §§ 1601 et seq. ("TILA" and "HOEPA") to enforce the plaintiffs' right to rescind a consumer credit transaction, to void the security interest in the Plaintiffs' home, and to recover statutory damages, enhanced HOEPA damages, reasonable attorney's fees and costs by reason of violations of the Act and Regulation Z, 12 C.F.R. § 226 (hereinafter called "Regulation Z"). Claims are also made under the Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. § 2601 et seq., and the Racketeer Influenced And Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. This complaint also asserts the right of a class of similarly situated persons defined below.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court by 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331.

## PARTIES

3.      Plaintiffs, Randy Howard and Trisha Howard, "the Howards" own and reside in a home at 3057 Kendale Drive, Mobile, AL 36606.

4.      Bayrock Mortgage Corporation, ("Bayrock") is incorporated in Georgia and its principle address is 11575 Great Oaks Way, Suite 300, Alpharetta, GA 30022.

5.      Bayrock is a "creditor" as that term is defined at 15 U.S.C. § 1602(f) and at all times relevant hereto. Bayrock, in the ordinary course of business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or by written agreement which is payable in more than four installments.

6.      Plaintiffs' loan and those of class members are "federally related" loans, as that term is used by RESPA.

7.      Bayrock purportedly assigned Plaintiffs' loan to Bank of America, National association as Successor by Merger to LaSalle Bank National Association, as Trustee for the registered holders of Bears Stearns Asset Backed Securities I Trust 2007-HE4 Asset-Backed Certificates, Series 2007-HE4, ("LaSalle").

8.      LaSalle is liable for the claims made herein pursuant to 15 U.S.C. § 1641.

9.      First American Corporation ("FACO") is California corporation with its principal place of business in Santa Ana, California.

10.     United General Title Insurance Company ("United") is a Colorado corporation and is a subsidiary of FACO. United is a title insurance company.

## FACTUAL ALLEGATIONS

11.     On January 19th 2007, the Plaintiffs entered into a consumer transaction with Bayrock in which Bayrock extended consumer credit that was subject to a finance charge initially payable to Bayrock and later assigned to LaSalle.

12.     As part of this consumer credit transaction, Bayrock retained a security interest in a home located at 3057 Kendale Drive, Mobile, AL 36606, the principal dwelling of the Plaintiffs.

13.     Bayrock is a sub-prime mortgage lender based in Georgia which originates sub-prime mortgage loans in several states, including Alabama. Bayrock uses various settlement agents to close its loans.

14.     At all times relevant herein, the settlement agents were, on information and belief, acting at the direction of and were the agents of Bayrock.

15.     The settlement agent for the Plaintiffs' transaction, whose use was required by Bayrock, was an entity known as Lenders' First Choice ("LFC").[1]

16.      LFC performed a variety of settlement services for Bayrock for which it was paid a closing fee incident to the extension of credit to the Plaintiffs. The "settlement or closing fee" fully compensated LFC for each and every service it performed. The fee paid to the settlement agent for its services is disclosed, pursuant to federal law, on Line 1101 of the applicable HUD-1 Settlement Statement and must be disclosed for TILA purposes as part of the "Finance Charge."

17.     For loans such as the Plaintiffs', the settlement agent does not hold closings in its office, or any other office traditionally used for closings. The closings are, instead, administered by a notary hired by the settlement agent whose only role is to deliver the necessary documents to the borrowers and obtain the appropriate signatures.

18.     Under applicable federal law Bayrock is allowed to pass along the fees, associated with a loan closing that are paid to third parties hired to perform settlement services, as part of the "Amount Financed", provided those costs are *bona fide*, reasonable, necessary and clearly and conspicuously disclosed and itemized on the HUD Settlement Statement. Settlement costs associated with title services must be set out on Lines 1101 through 1113 of the Settlement Statement.

19.     Furthermore, LFC and Bayrock are required by RESPA and TILA to separately list and itemize each of these charges including any commission earned for the sale of title insurance and any other services provided in connection with the closing.

20.     For each loan, Bayrock prepares and provides to the settlement agent "Closing Instructions" which set out the amounts to be charged and included in the HUD-1 Settlement Statement for various fees. Many of these fees are marked up or padded in violation of RESPA.

21.     The settlement agent and Bayrock, through its Closing Instructions, as a matter of course charge borrowers fees for title searching, abstracting and title examination, in excess of the amounts actually paid to third parties for those services, in violation of applicable federal law.

22.     Pursuant to federal law, the amount paid by a borrower for title insurance required by the lender must be reflected on Line 1108 of the Settlement Statement. The amount that may be charged in premium for title insurance, including any commission, is set by the Alabama Insurance Department ("DOI") and other agencies for non-Alabama loans. The charges for title insurance premiums cannot exceed the filed or approved rates.

---

[1] Lenders' First Choice has filed for bankruptcy protection and is not made a defendant herein.

23.     Neither Bayrock nor the settlement statement itemized all the charges imposed or disclosed the payment of a sales commissions related the title insurance as required by 12 U.S.C. § 2603 and 24 C.F.R. § 3500, Appendix A.

24.     The amount charged for title insurance in the Plaintiffs' transaction exceeded the filed rate approved by the DOI and is an illegal markup or overcharge.

25.     United issued a title insurance policy in connection with the Plaintiffs' loan.

26.     LFC was the agent of United, with respect to the issuance of that policy, as well as the calculation, imposition and collection of the charge reflected on Line 1108 of Plaintiffs' HUD-1 Settlement Statement.

27.     LFC and United failed to disclose commissions paid and received regarding title insurance issued as part of the Plaintiff's loan transaction.

28.     Plaintiffs were charged $275 for the title insurance policy issued by United through its agent, LFC. This charge is reflected on Line 1108 of the Plaintiffs' HUD-1 Settlement Statement.

29.      The legal charge, as determined by United's filed rate, for that policy was only $137.00.

30.     No commission was disclosed on the plaintiffs' HUD-1 settlement statement.

31.     The $275.00 charge imposed on Plaintiffs for title insurance premium was not *bona fide* or reasonable because that amount exceeds the amount allowed by the DOI.

32.     An unearned surcharge of $138.00 was added to the legal title insurance premium by LFC and United.

33.     At all times relevant herein, LFC was the agent of United and, pursuant to an agreement or understanding, United would compensate LFC by allowing it to keep a portion of

the premiums it collected as its compensation for writing the title insurance policies and performing those services required for "binding" a title insurance policy.

34.     On a monthly basis, LFC would remit a portion of the title insurance premiums it collected to United and retain a portion as its commission.

35.     Unbeknownst to Plaintiffs and class members, United and LFC had an agreement or understanding whereby LFC would charge flat fees, unrelated to the legal title insurance rates approved by regulating authorities, and the two, United and LFC, would split the flat fees.

36.     This arrangement constitutes an agreement or understanding, oral or otherwise, that business, incident to or part of a real estate settlement service (the purchase and sale of title insurance), shall be referred by LFC to United in exchange for the payment of a fee, kickback, or thing of value in connection with a transactions involving federally related mortgage loans.

37.     In the instant case, for example, LFC charged a flat fee of $275.00 while United's approved and filed rate called for a premium of only $137.00. If a commission rate of 70% is assumed[2] LFC could legally earn a commission of $95.90 ($137.00 X .7 = $95.90). Instead, under this scenario and pursuant to their arrangement, LFC earned a commission of $192.50 ($275.00 X .7 = $192.50). The difference, $96.60, constitutes a kickback paid by United to LFC for the referral of title insurance business. In fact, during the time period in question herein, LFC had an agreement whereby FACO and United were the exclusive source for title insurance sold by LFC and its parent Mercury.

38.     In Plaintiffs' transaction the $138.00 fee or sur-charge (the amount in excess of the legal rate) was tacked on to the "title insurance" charge by made by LFC. LFC performed no

---

[2] According to J. Robert Hunter, Director of Insurance for the Consumer Federation of America, (CFA) the split with title agents can be as much as 90 percent of the premium. See *Testimony of J. Robert Hunter, Director of Insurance before the House Committee on Financial Services Subcommittee on Housing and Community Opportunity* April 26th 2006.

additional compensable service for that fee. Pursuant to the rate filed and approved by the Alabama DOI, the charge was, by operation of law, illegal, marked-up, non-*bona fide* and was, therefore, a fee incident to the extension of credit and an unearned payment for other than services performed.

39.     In transactions, such as Plaintiffs', Federal law allows the recording costs to be passed along to the borrower, provided those costs are clearly and conspicuously reflected in the Settlement Statement and do not exceed the amounts actually paid to a government entity for recording. Those charges must be set out in Lines 1201 and 1202 of the HUD-1.

40.     The recording fee charge herein was excessive as shown below.

41.     On January 19th 2007, Plaintiffs' loan was closed and Plaintiffs executed all those documents necessary to obtain the loan and refinance the debt then due and owing and secured by their home.

42.     In connection with Plaintiffs' loan, the settlement agent obtained a title search or abstract from a separate company which rendered a full title report. The amount charged to Plaintiffs for those services was $175.00 for "Abstract or Title Search" (Line 1102). The actual cost of these services did not exceed $100.00.

43.     Plaintiffs' Settlement Statement also reflected, on Line 1201, a charge of $120 and on Line 1202 a charge of $190.50 for mortgage recording fees. The total recording fee actually incurred was only $153.45. Therefore, Plaintiffs were charged $157.05 above what was actually paid to the probate court for recording fees.

44.     Plaintiffs were also charged, on Line 1111, $25.00 for "wire fee." Upon information and belief, this charge does not relate to any separate service, is completely unearned

and was included in the Settlement Fee reflected in Line 1101 and should have been included in the "finance charge."

45.    On Line 1112, Plaintiffs were charged, $30.00 for a "delivery fee." Upon information and belief, this charge does not relate to any separate service, is completely unearned, was  included in the Settlement Fee reflected in Line 1101 and should have been included in the "finance charge."

46.    On Line 1106, $150.00, Plaintiffs were charged, for "Signing Fee." Upon information and belief, this charge does not relate to any separate service, is completely unearned, was included in the Settlement Fee reflected in Line 1101 and should have been included in the "finance charge."

47.    Plaintiffs were charged, on Line 1105, $65.00 for "Document preparation." Upon information and belief, this charge does not relate to any separate service, is completely unearned, was included in the Settlement Fee reflected in Line 1101 and should have been included in the "finance charge."

48.    The fact that the charges reflected in Lines 1102, 1105, 1106, 1108, 1111, 1112, 1201 and 1202 exceeded the actual costs of the services actually provided was unknown to Plaintiffs. The fact that those charges were marked up, illegal, excessive and otherwise improper, was unknown to, and unknowable by, Plaintiffs because the actual costs for providing or obtaining the services were not available to or discoverable by them and Bayrock actively deceived Plaintiffs about who was providing these services and the fact that they were being defrauded by the use of fraudulent HUD-1 settlement statements and TILA disclosures.

49.    The HUD-1 forms used by Bayrock and LFC also misstate their accuracy. At the bottom of each settlement statement the following text is found, "The undersigned hereby

acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction." Immediately following the statement are signature lines for the borrowers and LFC.

50.     The unknown and inherently unknowable nature of the unlawful charges did not give Plaintiffs any reason to inquire, investigate or discover the wrongdoing. As a practical reality, it was impossible for Plaintiffs, as laypersons, to detect Bayrock's and LFC's lending law violations.

51.     Plaintiffs have acted with due diligence with respect to their rights. The facts that support their causes of action were not knowable to them until shortly before the filing of the Complaint in this action and although they acted with due diligence, Plaintiffs did not know the identity of LaSalle, the assignee of their loan, until October 21st 2009.

52.     As part of the documents which must be presented to borrowers before closings, Bayrock is required by TILA and its implementing regulations, Reg. Z, to prepare certain written disclosures to be provided before closing. Under TILA and Reg. Z, Bayrock is required to clearly and conspicuously disclose the "amount financed" and the "finance charge," among other things, in connection with each loan.

53.     Pursuant to TILA and Reg. Z, lenders may exclude from the disclosed finance charge fees paid for title examination, title abstracting and title insurance only if those charges are "*bona fide*" and "reasonable." Reg. Z, § 226.4(c)(7).

54.     TILA also allows lenders to exclude fees paid for the recording of mortgages and other instruments only if those fees are actually paid to the governmental offices for recording. 15 U.S.C. § 1605(d)(1).

55.     Bayrock was required to include as part of the finance charge the "recording fee" charge listed on Line 1201 on Plaintiffs' Settlement Statement because it exceeds the amount that was actually paid to the government entity. However, the finance charge disclosed by Bayrock did not include any portion of the "recording fee" charge.

56.     The charges listed on Lines 1102, 1103 and 1111 were not included as part of the finance charge disclosed by Bayrock. This is in violation of TILA and Reg. Z. Those charges, purportedly for "Abstract or Title Search" and "Endorsements," were neither *bona fide* nor reasonable. Those charges were marked-up and/or split in violation of federal law. Therefore, those charges should have been included as part of the finance charge disclosed by Bayrock.

57.     Likewise, the charge listed in Line 1108, purportedly for "Title Insurance" was not *bona fide* or reasonable because it exceeded the actual cost of the insurance and the amount allowed by state law. Therefore, Bayrock was required by TILA and Reg. Z to include that charge as part of the disclosed finance charge but failed to do so.

58.     Plaintiffs' loan was subject to TILA and RESPA and also qualified as a "high-cost" or HOEPA loan as specified under the qualification "triggers" found at 15 U.S.C. § 1602(aa) and Regulation Z, at 12 C.F.R. § 226.32, by virtue of having met the fee and cost trigger or the annual percentage rate trigger or both.

59.     HOEPA imposes special disclosure requirements on creditors when either HOEPA trigger is satisfied. HOEPA requires a special ***advance*** notice (15 U.S.C. § 1639, Regulation Z § 226.32) to prospective borrowers that must be received at least three business

days *before* closing that must contain, since October 1st 2002, an advance disclosure of the loan's APR, Finance Charges, Amount Financed, Total of Payments and Monthly Payments. These so-called "Section 32" pre-closing notices were never sent to the Plaintiffs or class members.

60.     The predatory lending and mark-up scheme of Bayrock violated TILA and HOEPA because of inaccurate disclosures of the APR, Finance Charges and the Amount Financed on the Plaintiffs' loan and the loans of others. These inaccurate disclosures were material and give rise to actions for damages and loan rescission under TILA and HOEPA because the loans did not have the disclosures required by law. The loans violate TILA and the violations give rise to damages and rescission under TILA, HOEPA and Regulation Z.

61.     HOEPA requires lenders to give certain notices at least three business days prior to the closing of the loan. Bayrock failed to give any such notice on any HOEPA loans.

62.     The actions and violations complained of herein were either intentional or occurred because of the negligent supervision and training by the defendants of their agents and employees.

### EQUITABLE ESTOPPEL, EQUITABLE TOLLING AND CLASS ACTION TOLLING OF LIMITATIONS PERIOD

63.     Bayrock and the other defendants knowingly and actively misled the Plaintiffs and the class from pursuing their claims by, among other things:

a.     Engaging in a scheme that was by its nature and design "self-concealing;"

b.     Requiring settlement agents to allocate closing fees as dictated in closing instructions;

c.     Knowingly and actively mischaracterizing and misrepresenting, *inter alia*, actual amounts paid for abstracts, document fees, wire fees, title search, title

examinations, notary fees, endorsement fees, title insurance and recording charges such that non-*bona fide* and illegal charges were wrongfully excluded from the calculation of the "Finance Charge" and Amount Financed used to calculate the Annual Percentage Rate ("APR"), thereby materially misrepresenting these disclosures as well materially understating the APR;

      d.    Disseminating false and fraudulent HUD-1 Settlement statements that intentionally mischaracterize settlement charges, made incident to the extension of the credit, and thereby concealing the fact that said charges should be calculated as part of the "Finance Charge" as opposed to the "Amount Financed" and that more than the legal premium was charged for title insurance;

      e.    Intentionally including Finance Charges in the Amount Financed thereby causing the APR to appear lower and therefore more competitive;

      f.    Knowingly and actively misrepresenting the Finance Charges, the Amount Financed and APR's on the TILA Disclosure Statements provided to Plaintiff and class members by, among other things, failing to include in its calculations all of the charges' described above, that were not *bona fide*, reasonable, lawful and/or not actually paid to third parties;

      g.    Falsely certifying that Plaintiffs' and class members' HUD-1 settlement statements were accurate;

      h.    Intentionally omitting and failing to make the disclosures required by 15 U.S.C. § 1639;

i.      Intentionally suppressing the fact that the loans at issue are high cost loans by failing to give plaintiffs and class members "Section 32" notices that are required three days in advance of consummation of a HOEPA loan by 12 C.F.R. § 226.32(c); and

j.      By other acts and violations that will be discovered during discovery.

64.    Plaintiffs and class members exercised reasonable consumer diligence during their loan transactions and dealings with Defendants and in the reviewing of their loan documentation, they could not have, nor have been reasonably expected to, uncover the true facts.

## COUNT I

## RESCISSION

65.    Plaintiffs reallege the relevant paragraphs above in support of this count.

66.    The consumer credit transaction complained of herein was subject to the Plaintiffs' right of rescission as described by 15 U.S.C § 1635 and Regulation Z § 226.23 (12 C.F.R § 226.23).

67.    In the course of this consumer credit transaction, Bayrock failed to deliver all "material" disclosures required by the TILA and Regulation Z, in at least the following ways, by not:

a.      properly and accurately disclosing the "amount financed" using that term in violation of Regulation Z §§226.18, 226.23(b) and 15 U.S.C § 1638;

b.      clearly and accurately disclosing the "finance charge" using that term in violation of Regulation Z § 226.4 and 226.18(d) and 15 U.S.C § 1638(a)(3);

c.      clearly and accurately disclosing the "annual percentage rate" using that term in violation of Regulation Z § 226.18(e) and 15 U.S.C § 1638(a)(4);

       d.      disclosing that the loan was a high cost or HOEPA loan as defined by 15 U.S.C. § 1602(aa);

       e.      making the other disclosures required by HOEPA; and

       f.      using mortgage terms that were compliant with HOEPA.

68.     The Plaintiffs have a continuing right to rescind the transaction pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3).

69.     Plaintiffs rescinded the transaction by sending to Bayrock at 111575 Great Oaks Way, Suite 300, Alpharetta, GA 30022 and by U.S. Mail, postage prepaid, certified mail, return receipt requested, a notice of rescission.

70.     More than 20 calendar days have passed since Plaintiffs' gave their notice of rescission.

71.     Bayrock has failed to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction, including the security interest described in Paragraph 8, as required by 15 U.S.C. § 1635(b) and Regulation Z 226.23(d)(2).

72.     Bayrock has failed to return to the Plaintiffs any money or property given by the Plaintiffs to anyone, including Bayrock, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

73.     LaSalle, as Bayrock's assignee, is liable for all damages Plaintiffs could claim of Bayrock pursuant to TILA and HOEPA.

74.     As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 1635(a) and 1640(a), Bayrock and LaSalle are liable to Plaintiffs for:

       a.      Rescission of this transaction;

       b.      Termination of any security interest in Plaintiffs' property created under

the transaction;

c.      Return of any money or property given by the Plaintiffs to anyone, including Bayrock, in connection with this transaction;

d.       Twice the finance charge in connection with this transaction, but not less than $400 nor more than $4,000.00;

e.      The right to retain proceeds to vest in plaintiffs; and

f.      A reasonable attorney's fee.

## PRAYER FOR RELIEF

**WHEREFORE**, it is respectfully prayed that this Court:

A.      Assume jurisdiction of this case;

B.      Rescind the transaction of January 19th 2007 between the Plaintiffs and Bayrock.

C.      Order Bayrock and LaSalle to take all action necessary to terminate any security interest in Plaintiffs' property created under the transaction and that the Court declare all such security interests void, including but not limited to the mortgage related to the transaction of January 19th 2007 between the Plaintiffs and Bayrock;

D.      Order the return to the Plaintiffs of any money or property given by the Plaintiffs to anyone, including Bayrock, in connection with the transaction;

E.      Award the Plaintiffs twice the finance charge in connection with this transaction, but not less than $400 or more than $4,000 and all other damages available as provided under 15 U.S.C. § 1640(a);

F.      Order that the right to retain the loan proceeds vests in Plaintiffs;

G.   Award actual damages in an amount to be established at trial;

H.   Award the Plaintiffs costs and a reasonable attorney's fee as provided under 15 U.S.C. § 1640(a);

I.   Award such other and further relief as the Court deems just and proper.

## COUNT II

## HOEPA VIOLATIONS

75.   Plaintiffs re-allege all the preceding allegations referenced as if set out here in full.

76.   As a consequence of the marking up and splitting of the charges reflected in Lines 1102, 1105, 1106, 1108, 1201, 1204 and/or 1301 those charges are "points and fees," by operation of Reg. Z, 24 C.F.R. 226.32(b), as defined under HOEPA.

77.   The Plaintiffs' loan is a high cost loan within the meaning of HOEPA, 15 U.S.C. § 1602(aa), because the total points and fees charge in connection with it exceed 8% of the total loan amount.

78.   Because Plaintiffs' loan meets the HOEPA definition of a high cost mortgage, the transaction was subject to additional disclosure requirements that must be provided three days in advance of the consummation of the transaction. 15 U.S.C. § 1639(b).

79.   Bayrock did not furnish the required HOEPA disclosures to Plaintiffs three days prior to their settlement or at any other time.

80.   Bayrock's failure to provide the required HOEPA disclosures was material.

81.   Bayrock's failure to give Plaintiffs the disclosures required by HOEPA three days prior to settlement violates 15 U.S.C. § 1639(a) and (b), entitling Plaintiffs to actual and statutory

damages under 15 U.S.C. § 1640(a). In addition, the failure to provide those disclosures extends Plaintiffs' right to rescind the transaction for up to three years after its consummation.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Bayrock and LaSalle rescinding the transaction, for damages and fees pursuant to 15 U.S.C. § 1635(b) and (g); and, pursuant to 15 U.S.C. §§ 1639(j), and 1640(a), award statutory damages as provided in 15 U.S.C. § 1640(a)(4) in the amount of all finance charges and fees paid by Plaintiffs for each substantive HOEPA violation; reasonable attorney fees and costs and such other relief at law or equity as this Court may deem just and proper.

## COUNT III

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c) AND 1962(d)

82.     Each proceeding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

83.     This count is against defendants United and FACO only.

84.     United and FACO have violated the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1962(c) and (d). The Defendants, United and FACO, along with Mercury Companies, Inc., ("Mercury")[3], were all "persons" employed by or associated with an enterprise, LFC, which engaged in, or the activities of which, affect interstate or foreign commerce. Furthermore United and FACO have violated RICO, 18 U.S.C. §§ 1962(c) and 1862(d), by participating in the facilitation, operation and/or management of the enterprise, LFC.

85.     Over the past decade, FACO has provided financing to Mercury, the parent company of LFC, in multiple transactions and Mercury is heavily indebted to FACO.

---

[3] Mercury is not made a defendant herein because it has filed for bankruptcy protection.

86.     Furthermore FACO is the majority shareholder of Mercury.

87.     LFC is a California subsidiary of Mercury.

88.     FACO and United along with Mercury conspired to maximize their loan origination and title insurance profits by padding title insurance, recording and settlement fees in violation of RESPA and state laws regulating the premiums for title insurance.

89.     In each and every transaction at issue herein interstate wires and carriers were used for the transmission of funds and documents related to class members' closings. The number of predicate acts of mail and wire fraud number in the thousands or tens of thousands.

90.     FACO is a person under the definitions found in 18 U.S.C. § 1961 and it participated in an enterprise to commit mail and wire fraud, prepare and disseminate misleading and false HUD-1 settlement statements and RESPA required disclosure forms to consumers.

91.     The commission of these predicate acts rises to the level of a pattern of racketeering activity prohibited by the RICO statute. FACO also conspired to commit all these violations with Mercury and LFC. LFC conspired with Mercury and FACO to maximize their profits through the preparation of inaccurate and fraudulent HUD-1 settlement statements and RESPA disclosures to mortgage borrowers.

92.     United is also a person under the definitions in 18 U.S.C. § 1961 and participated in an enterprise to commit mail and wire fraud, preparation of inaccurate and fraudulent and misleading consumer HUD-1 settlement statements and RESPA disclosures. The commission of these predicate acts gives level to a pattern of racketeering activity prohibited by the RICO statute as set forth below.

93.     LFC was the agent of FACO and United with regard to many if not most of the settlement and title insurance charges at issue. On information and belief, numerous other

settlement service companies also participated in the illegal conduct.

94.    Victims of this conduct include:

| Borrowers | Closing Date |
|---|---|
| Mark and Donna Barton | September 26, 2006 |
| Buddie Lamar Burt, Jr. | |
| Verletta Gay Donald | November 1, 2008 |
| Barbara H. Baker | October 19, 2005 |
| Vilma Hall | June 22, 2006 |
| Jonathan and Sharron W. Edwards | June 16, 2006 |
| Willie Mae and Simon Goldston | |
| Erwin and Lillie Grayson | November 28, 2006 |
| Sheila F. Jackson and Michael D. Garity | |
| Robert and Rosie Pouncy | |
| Christopher and Shannon Wilson | February 14, 2006 |
| Randy Howard | January 24, 2007 |

95.    Also included would be other putative class members who are consumers that obtained loans closed by LFC with title insurance written through United. Each of these persons was directly injured by the acts of the RICO defendants. Their injuries include financial injuries, financial injury in the form of illegally marked up title insurance charges, increased interest and finance charges, and out of pocket losses of approximately $500.00 per loan for illegally marked up and padded settlement fees and title insurance premiums.

96.    United and FACO entered into a scheme whereby United and LFC charged flat fees for title insurance instead of the legal and approved rates. The effect of this scheme was to avoid state laws regulating the premiums and thereby garner illegal profits.

97.    Defendants committed multiple acts of mail and wire fraud (as well as other unlawful acts) constituting a pattern of racketeering activity through a conspiracy in which they directly or indirectly participated in, maintained an interest in and conducted the affairs and conduct of the enterprise, LFC, that directly, proximately and foreseeably caused injury to the Plaintiffs.

98.     Interstate wires, private carriers or U.S. Mail were used numerous times by Defendants and the enterprise to complete the transactions of the named plaintiffs and that of each member of the putative class. A description of such use regarding the named plaintiffs' transactions is set out below. Putative class members' loans were all closed in a similar manner, also making use of interstate carriers and wires.

99.     Regarding the Howard transaction, facsimile or interstate wires in the form of email was used to order an appraisal on or about January 12th 2007. The completed appraisal was transmitted by email or facsimile on or about January 12th 2007.

100.     The Howard transaction was closed on January 19th 2007. Interstate wires were used to email the closing package to the local notary who brought the documents to the Howard's home for execution. A few days prior to the closing, interstate wires were used to email preliminary documents between LFC's office, which is located in Frisco, Texas, from Bay Rock's office in Alpharetta, Georgia. After documents were executed, they were sent to Lenders First Choice's office in Frisco by U.S. mail or private interstate carrier. The Howard mortgage was recorded on February 22nd 2007. Again, US mail or an interstate carrier was used to send the executed mortgage from LFC's office to the Probate Court of Mobile County, Alabama. Interstate wires were used to transfer the funds for the transaction five days after the closing, or on January 24th 2007. There were also facsimile transmissions using interstate wires with regard to the Howard loan on January 19th 2007.

101.     The Plaintiffs' HUD-1 was the standard-form; RESPA-required document used by LFC in the Plaintiffs' and Class Members' HOEPA and non-HOEPA mortgage loan transactions. These HUD-1 Settlement Statements uniformly concealed or misrepresented the nature or payment of proceeds to United and/or to other settlement service providers.

102.    Plaintiffs have no knowledge of any criminal convictions for violations of the predicate acts.

103.    The predicate acts of mail fraud and wire fraud relating to the named plaintiffs were all committed between October of 2006 and February of 2008 and all of them involve United. On information and belief the predicate acts with regard to putative class members began in 2006 and continued thru 2008. Furthermore, United engaged in similar conduct with regard to thousands of similarly situated consumer mortgage borrowers. The predicate acts of United and FACO are all clearly related to an effort to fraudulently induce unsuspecting consumers into residential mortgage loans which contain undisclosed finance charges in the form of illegally marked up title insurance and settlement service charges.

104.    Defendants have engaged in the unlawful conduct over a period of years and have depended on it as a major source of income and profit for their businesses and the enterprise. The predicate acts involve different victims at different points in time, all as one aspect of United's and FACO's way of doing business.

105.    The purpose of the enterprise was to solicit mortgage-closing clients and to maximize profits through illegally marked up settlement service fees and hidden charges. The enterprise functioned as a well-planned self-concealing scheme to violate the RESPA and TILA and to mislead consumers with regard to the true cost of mortgage financing and title insurance obtained through United.

106.    In the enterprise alleged above, the relationship among its participants was continuous.

107.    By United's and FACO's design, their scheme allowed them to manage and direct the affairs and conduct of LFC, the enterprise, and Mercury's participation in the scheme. FACO

controlled the actions of United by a program of centralized policy-making, policy dissemination and training, emanating from its central offices. The patterns of racketeering activity, including wire and mail fraud, were all committed in an effort to charge consumers padded and excessive settlement and title insurance fees as stated herein. The transmission of the funds and documents used to carry out the scheme by use of interstate carriers and wires was necessary to carry out the scheme.

108.    The enterprise engaged in a pattern of racketeering activity by committing a pattern of more than two predicate (literally thousands) acts of mail fraud, and wire fraud, each of which are indictable offenses, within a single ten year period, in violation of 18 U.S.C. §§ 1341, 1343 and 1956. The Defendants used the United States Postal Service, interstate carriers and interstate wires for advancing, furthering and carrying out the scheme with specific intent to defraud Plaintiffs and class members. Said predicate acts were related and pose a continuing threat of criminal activity.

109.    The enterprise was designed to extract bogus fees and charges, pure "loan padding" in industry parlance, from the Plaintiffs and to funnel income generated by those bogus fees and charges to the Defendants.

110.    The enterprise used the mails and private or commercial interstate carriers (e.g. Federal Express) as a part of and in furtherance of their scheme or artifice to defraud the Plaintiffs in violation of 18 U.S.C. § 1341.

111.    Phone calls, emails, mailings, facsimile transmissions and wire transfers were made across state lines from 48 of the 50 states, thereby having an effect on interstate commerce.

112.    The enterprise also used interstate wires as a part of and in furtherance of their scheme or artifice to defraud the Plaintiffs in violation of 18 U.S.C. § 1343.

113.    The enterprise used the interstate wires to market their settlement services and title insurance programs and to solicit business from potential customers.

Wherefore Plaintiffs demand damages pursuant, to 18 U.S.C. § 1964, for treble damages; prejudgment interest and attorney fees.

## COUNT IV

## CLASS ALLEGATIONS

114.    Plaintiffs re-allege all the preceding allegations by reference as if set out here in full.

115.    The identities of the class members are readily identifiable through computer records and paper records, regularly maintained in Defendants' course of business and will be further defined after discovery.

116.    The Class is so numerous as to make it impracticable to bring all members of the Class before the Court. It is believed that the Class includes thousands of members. In all instances, such persons are unaware that claims exist on their behalf.

117.    The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class.

118.    The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests antagonistic to the claims of the Class. The Plaintiffs are aware that they cannot settle this action without Court approval. The Plaintiffs' interest in this action is antagonistic to the interest of the defendants, and Plaintiffs will vigorously pursue the claims of the Class.

119.    The representative plaintiffs have retained counsel who are competent and experienced in consumer class action litigation, and who have successfully represented

consumers in complex class actions. Counsel has agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court.

120.    Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

121.    There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include:

     a.       Is the TILA violation apparent on the face of the loan documents;

     b.       Are the loans subject to HOEPA;

     c.       What measure of damages is appropriate;

     d.       What declaratory or injunctive relief is appropriate;

     e.       Are the loans subject to rescission; and

     f.       Has RICO been violated?

122.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiff and the class are identical and will require evidentiary proof of the same kind and application of the same law.

123.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed class members to prosecute their claims individually. Trial of Plaintiffs' claims is manageable.

124.     Unless a class-wide injunction is issued, defendants may continue to commit violations against residential mortgage borrowers.

125.     The representative Plaintiffs will seek to identify all class members through discovery as may be appropriate and will provide to the class such notice of this action as the Court may direct.

## COUNT V

## RESCISSION AND DECLARATORY JUDGMENT

126.     Plaintiffs re-allege and adopt by reference all of the foregoing facts and allegations as set forth herein above.

127.     Plaintiffs and the Plaintiff's Class bring this action pursuant to Rules 23(b)(2) and 57 of the Federal Rules of Civil Procedure in that an actual controversy exists between the parties concerning their right to rescind their mortgage loans under 15 U.S.C. § 1635.

128.     As a result of Bayrock's aforesaid violations of TILA and HOEPA Plaintiffs and Class Members have retained their right to rescind (as to loans that closed within three years *prior* to the filing of the complaint herein and as to properties not sold during such period) their loans under 15 U.S.C. § 1635. Accordingly, Plaintiffs and Class Members pray for a declaratory judgment recognizing and authorizing rescission by Plaintiffs and Class Members, this declaratory judgment count giving notice to Bayrock and assignees of Plaintiffs' and Class Members' demands for rescission, subject to the individual choice of withdrawing this notice of rescission after their rights are declared.

## PRAYER FOR RELIEF

WHEREFORE, on all asserted causes of action against Defendants, Plaintiffs pray for judgment against Defendants, and each of them, jointly and severally, as follows:

A.      For an Order certifying that this action may be maintained as both a Plaintiff class action, as defined above, under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3);

B.      For an Order appointing the Plaintiffs to act as representatives of the Class Members and the Class;

C.      For an Order appointing the undersigned counsel to act as interim Class Counsel pursuant to Fed. R. Civ. P. 23 to act on behalf of the putative Class before the determination of whether to certify the Class is made;

D.      For an Order appointing the undersigned counsel as Class Counsel;

E.      For an Order directing that reasonable notice of this Class action be given to all members of the Class at the appropriate time after discovery and dispositive motions have been resolved;

F.      For violating RESPA, an Order finding that the Defendants are jointly and severally liable as a matter of law to each member of the Class for treble damages; prejudgment interest and attorney fees;

G.      For violating RICO, an Order finding that the Defendants are jointly and severally liable as a matter of law to each member of the Class for treble damages; prejudgment interest and attorney fees;

H.      For violating HOEPA and TILA, a declaration that Class Members whose loans were closed, within the three-year preceding the filing of this case, remain entitled to rescind their loans and by this complaint have given notice of rescission subject to withdrawal of same after determination of their rights, and that Defendants are prohibited from foreclosing on the Plaintiffs' and Class Members' mortgages pending such declaration;

I.      For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, an Order finding that Defendants are jointly and severally liable as a matter of law, pursuant to §§ 1640 and 1641(d), Class Members for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; and (4) an amount equal to two times the sum of all, finance charges and fees paid by the Class Members for two substantive violations of HOEPA, one disclosure violation under TILA,; plus pre-judgment interest; and attorney fees;

J.      For violating the TILA's disclosure requirements an Order finding that Defendants are jointly and severally liable as a matter of law, pursuant to §§ 1640 and 1641(a), to Class Members for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1640 and 1641(a), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; plus prejudgment interest and attorneys fees;

K.      For violations of the above laws a finding of assignee liability under the provisions of HOEPA and TILA pursuant to §§ 1641(d) and 1641(a);

L.      For a permanent injunction enjoining Defendants, together with their officers, directors, employees, agents, partners or representatives, successors and any and all persons acting in concert with them or by agreement with them from directly or indirectly engaging in the wrongful acts and practices described above, all for the benefit of the Class Members; and

M.      For an order directing disgorgement or restitution against Defendants as to each Class Member and the imposition of an equitable constructive trust over such amounts for the benefit of the Class Members; and

N.    A judgment of monetary damages against Defendants and each of them as to each Plaintiff for not only such prohibited or excess fees, but for all interest that has been contracted for or charged or paid by each of the Class Members, through the date of judgment or settlement and the value of such interest that is due and owing in the future; and

O.    For a judgment of punitive damages against the Defendants in a sum that is fair and reasonable; and

P.    For reasonable attorneys' fees as provided by law and statute; and

Q.    For pre-and-post judgment interest as provided by law in an amount according to proof at trial; and

R.    For an award of costs and expenses incurred in this action; and

S.    For such other and further relief as the Court may deem necessary and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

Earl P. Underwood, Jr. (UNDEE6591)
Attorney for Plaintiffs
Law Offices of Earl P. Underwood, Jr.
Fairhope, AL 36532
Telephone: (251) 990-5558
Facsimile: (251) 990-0626
epunderwood@alalaw.com

/s/ Kenneth J. Riemer
Kenneth J. Riemer
Attorney at Law
P.O. Box 1206
166 Government St. (36602)
Mobile AL 36633
Telephone: (251) 432-9212

PLAINTIFFS REQUEST SERVICE BY CERTIFIED MAIL TO THE FOLLOWING:

Bayrock Mortgage Corporation
c/o National Registered Agents
150 South Perry Street
Montgomery, Al 36104

First American Corporation
The First American Corporation
1 First American Way
Santa Ana, California 92707

United General Title Insurance Company
c/o John Matthews
2000 Interstate Pk Suite 204
Montgomery, Al 36109

Bank of America, NA
C/O The Corporation Company
2000 Interstate Park Drive Suite 204
Montgomery, Al 36109